25CA2385 Peo in Interest of TFS-G 08-13-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA2385
City and County of Denver Juvenile Court No. 23JV30908
Honorable Lisa Gomez, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of T.F.S-G., a Child,

and Concerning W.W.S. a/k/a W.S.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Welling and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 13, 2026

---

Miko Brown, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parent' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     W.W.S., also known as W.S., (mother) appeals the judgment terminating her parent-child legal relationship with T.F.S-G. (the child).  We affirm.

## I.     Background

¶ 2     In September 2023, Denver Human Services (the Department) received a report that the then-three-year-old child had been found walking around mother's apartment complex without adult supervision.  When the apartment manager took the child back to mother's apartment, mother was lying on the bed unresponsive with drug paraphernalia next to her.  In a subsequent welfare check by law enforcement, mother admitted to using fentanyl.  The child was placed with her maternal aunt on an emergency basis.

¶ 3     About three weeks later, the Department filed a petition in dependency or neglect based on concerns that mother was unable to care for the child because of her continued substance use.  The juvenile court granted temporary legal custody of the child to the Department and, after the aunt told the Department she could no longer care for the child, the child was placed in foster care.

¶ 4     Because mother was reportedly an enrolled member of the Standing Rock Sioux Tribe (the Tribe), the Department provided

notice of the petition to the Tribe. The juvenile court later confirmed the child's enrollment eligibility and, thus, determined that the Indian Child Welfare Act of 1978 (ICWA) applied.

¶ 5     The juvenile court adjudicated the child dependent and neglected and adopted a treatment plan requiring mother to participate in substance use treatment, address her mental health, and develop a safe and supportive relationship with the child.

¶ 6     A year and a half later, the Department moved to terminate mother's parental rights. The juvenile court granted the motion more than two years after the petition was filed. As relevant to this appeal, the court found that the Department had made active efforts to prevent the breakup of the family but that those efforts had been unsuccessful due to mother's lack of engagement and continued concerns about her substance use and mental health.

## II.    Active Efforts

¶ 7     Mother contends that the juvenile court erred by finding that the Department made active efforts to keep the family together because it did not provide mother with a cell phone or otherwise assist her with communication barriers. We discern no error.

A. Applicable Law and Standard of Review

¶ 8 The juvenile court may terminate a parent-child legal relationship if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 9 Under ICWA, a party seeking termination of parental rights to an Indian child must "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Active efforts require "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. This standard is "more demanding" and requires a "greater degree of engagement" than the "reasonable efforts" standard that applies in non-ICWA cases. *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶¶ 2, 31.

¶ 10    At a minimum, a department must "identify and secure the resources and services parents need to successfully satisfy court treatment plan objectives and support the parents through the treatment plan goals." *Id.* at ¶ 32.  Federal regulations provide some examples of active efforts, including conducting comprehensive assessments; identifying appropriate services and "actively assisting the parents in obtaining such services"; inviting tribal representatives to participate in providing support and services to the family; contacting extended family members; offering culturally appropriate family preservation strategies; supporting regular family time; identifying community resources; and monitoring progress and participation in services.  25 C.F.R. § 23.2.

¶ 11    But there is "no one-size-fits-all formula for 'active efforts.'" *My.K.M.*, ¶ 32.  Instead, active efforts should be "tailored to the facts and circumstances of the case." *Id.* (quoting 25 C.F.R. § 23.2). To that end, "[c]ourts should analyze an agency's active efforts by considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan." *Id.* at ¶ 33.

¶ 12    The active efforts standard does not require a department to persist with futile efforts, such as when a parent voluntarily absents themselves from a proceeding and cannot be located. *People in Interest of A.V.*, 2012 COA 210, ¶ 12. Thus, a court may consider a parent's unwillingness to participate in treatment or engage with resources as part of its active efforts analysis. *Id.*

¶ 13    Whether a department made active efforts under ICWA is a mixed question of fact and law. *My.K.M.*, ¶ 20. We review the juvenile court's factual findings for clear error and review de novo whether those findings satisfy the active efforts requirement. *Id.*

## B.    Analysis

¶ 14    The juvenile court concluded that the Department had made active efforts to rehabilitate mother and prevent the breakup of her family. Among other things, the court found that the Department (1) "actively attempt[ed] to engage [m]other" in substance use treatment, family time, and mental health treatment; (2) repeatedly and consistently communicated with mother as it was able; (3) stayed in consistent contact with the Tribe; (4) made "several referrals" for mother to achieve the objectives in her treatment plan; (5) arranged for transportation; and (6) attempted to place the child

5

with her maternal aunt. The court also found that the Department had actively attempted to keep the child connected to her family and tribal community by collaborating with the Tribe and helping to enroll the child with the Tribe. Nonetheless, the court found that mother's "lack of engagement . . . left the Department unable to effectuate the goal of rehabilitating [her]," thus rendering the Department's efforts to keep the family together unsuccessful.

¶ 15 The record supports the juvenile court's findings. The caseworker testified that the Department referred mother for a substance abuse evaluation and then to an inpatient substance abuse treatment facility. Further, because mother had identified transportation as a barrier, the caseworker provided her with bus passes and even offered to personally drive mother to the treatment program on several occasions. But mother repeatedly declined the transportation assistance and did not identify any other barriers to treatment that the Department could have helped her overcome.

¶ 16 The caseworker also testified that she referred mother to two programs that would have helped her with housing and provided additional support to "alleviate the barriers" she faced in getting to treatment. But both programs discharged mother because their

providers could not get ahold of her.  The caseworker then referred mother to a life skills worker who diligently tried to contact and locate mother, even searching the park where mother was believed to be living.  But mother was discharged from that program as well, again because she did not respond to attempts to reach her.

¶ 17     Next, the caseworker's report, which was admitted into evidence, indicates that the Department arranged supervised family time for mother and the child at the beginning of the case.  But the caseworker testified that mother only attended about half of those visits.  Then, about a year before the termination hearing, a mandatory protection order was entered in mother's criminal case that prevented her from having contact with the child.  As a result, the Department could not facilitate family time, and mother had not seen the child for more than a year at the time of the hearing.

¶ 18     The caseworker further testified about her extensive efforts to communicate and engage with mother throughout the case.  The caseworker was able to meet with mother a few times, but mother did not follow up after those meetings.  Still, notwithstanding mother's general lack of responsiveness, the caseworker repeatedly and consistently called and texted her — mostly to no avail.  In

attempting to locate mother, the caseworker asked mother's sisters if they knew where she was or how to reach her, searched internet and court records, sent messages to mother on social media, checked the Department's databases, and went multiple times to the park where mother was said to be living. But despite these efforts, there were long periods of time — at one point, about eight months — in which mother did not contact the caseworker at all.

¶ 19 The caseworker also maintained consistent communication with the Tribe and assisted with the child's tribal enrollment by completing and submitting the child's enrollment application. The caseworker's report indicates that she provided regular updates to the Tribe, and a tribal representative testified that the Department had "been in consistent contact with [her] program" during the case. The tribal witness also testified that the Department worked with the Tribe to place the child with family or in a tribal foster home but that no ICWA-preferred placements were available.

¶ 20 Both the caseworker and the Tribe's expert witness agreed that it was mother's lack of engagement — not the Department's lack of effort — that prevented her from receiving the necessary support. The caseworker opined that mother's inconsistent contact

8

prevented the Department from alleviating barriers and "implement[ing] supports" for mother. And the Tribe's expert witness opined that the Department made active efforts throughout the case but that those efforts were unsuccessful due to mother's lack of engagement, lack of communication, and instability.

¶ 21    Notwithstanding this evidence of the caseworker's extensive efforts to engage mother, mother asserts that the Department's efforts were insufficient because it did not provide her with a phone. We are not persuaded. To start, mother never raised the lack of a phone as a barrier — either to the Department or to the juvenile court. She did not testify that she had been unable to engage in treatment because she did not have a phone, nor did she argue that the Department's efforts were deficient because it failed to provide her with one. Thus, the juvenile court had no opportunity to make factual findings as to whether mother needed a phone (or assistance with phone service) to comply with her treatment plan. We cannot make those findings on appeal. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 18 ("[T]rial courts make factual findings and appellate courts 'pronounc[e]'

law." (citation omitted)); *People in Interest of J.L.*, 121 P.3d 315, 318 (Colo. App. 2005) ("[W]e cannot make factual findings of our own.").

¶ 22    Moreover, even assuming that mother may have needed a phone at some point in the case, we cannot conclude that the Department's failure to provide one undermines the juvenile court's overall active efforts determination. As noted above, the adequacy of the Department's active efforts turns on the "totality of the circumstances" and "all services and resources provided" to the parent. *My.K.M.*, ¶ 33. Considering the Department's efforts as a whole, and viewing those efforts in conjunction with mother's lack of engagement, we discern no error in the juvenile court's determination that the Department made active efforts.

## III.    Additional Time

¶ 23    Mother also contends that the juvenile court erred by finding there was no less drastic alternative to termination of her parental rights. But the only alternative she identifies is allowing her more time to come into compliance with her treatment plan. She points out that she had entered inpatient substance use treatment two weeks before the hearing, had expressed an interest in becoming a better parent, and was generally on a "positive trajectory."

10

¶ 24     We do not view mother's argument as one for a less drastic alternative.  A less drastic alternative is a "permanency outcome" short of termination — such as an allocation of parental responsibilities (APR) — that serves the child's best interests. *People in Interest of H.L.B.*, 2025 COA 86, ¶ 19  (*cert. granted* Feb. 2, 2026).  Mother does not argue for such an outcome.  Instead, she contends that the court should have either denied or reserved ruling on the termination motion to allow her more time to establish her ability to parent the child.  That argument is more appropriately treated as a challenge to the juvenile court's finding that mother could not become fit within a reasonable time.  Because the court's finding is supported by the record, we discern no basis for reversal.[1]

A.     Applicable Law and Standard of Review

¶ 25     In determining whether a parent's conduct or condition is likely to change and whether the parent can become fit within a

---

[1] Even if we were to construe mother's argument as a challenge to the juvenile court's less drastic alternative finding, we would be bound to affirm that finding because it has record support for the reasons below.  *See People in Interest of B.H.*, 2021 CO 39, ¶ 80.  In short, for the same reasons the juvenile court did not err by finding that mother could not become fit within a reasonable time, giving her additional time to become fit was not a viable alternative.

11

reasonable time, the juvenile court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006). What constitutes a reasonable time is fact-specific and must take into account the physical, mental, and emotional conditions and needs of the child. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25.

¶ 26 A "reasonable time" is not an indefinite time. *Id.* And even when a parent has made progress on a treatment plan, the court need not give the parent additional time to become fit. *See id.* at ¶¶ 24-25. Moreover, when a child is under six years old, the juvenile court must consider the expedited permanency planning (EPP) provisions, which require that such children be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see also S.Z.S.*, ¶ 25.

¶ 27 Whether a juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10. We review the court's factual findings for clear error and its legal conclusions de novo. *Id.* The determination that a parent is not likely to become fit within a reasonable time is a

factual finding that we review for clear error. *See S.Z.S.*, ¶¶ 25, 29; *People in Interest of A.J.L.*, 243 P.3d 244, 256 (Colo. 2010).

## B.    Analysis

¶ 28    The juvenile court considered whether mother was likely to become fit within a reasonable time and found that she was not. The court acknowledged mother's recent "strides toward sobriety" but noted that she had "only been able to achieve sobriety for a short period of time." It found that, in contrast to mother's recent engagement and presumed sobriety, she had been "unengaged, whereabouts unknown, or incarcerated for the majority" of the proceedings. The court also explained that the EPP provisions applied and that the case had been open for more than two years.

¶ 29    The record supports the juvenile court's findings. By the time of termination, it had been more than a year and a half since the court adopted mother's treatment plan, but mother had not successfully resolved the Department's concerns. The caseworker testified that mother's issues with substance abuse and mental health were longstanding, as she had struggled with them for the "majority of her adult life." And although substance use and mental health treatment had been available to mother for more

than a year and a half, it was not until two weeks before the termination hearing that she engaged in such treatment.

¶ 30 The caseworker also testified that the protection order from mother's criminal case had prevented the child from developing a parent-child bond with mother. The caseworker opined that the child needed permanency and that, based on mother's lack of engagement and progress throughout the case, mother would not be able to meet the child's needs within a reasonable amount of time. The Tribe's expert witness agreed that the child needed permanency, having been in out-of-home placement for two years, and that termination was in the child's best interests.

¶ 31 In short, the juvenile court weighed mother's recent progress against her much longer history of disengagement and found that she was unlikely to become fit within a reasonable time. By asking us to conclude otherwise, mother effectively asks us to reweigh the evidence and substitute our judgment, which we cannot do. *See S.Z.S.*, ¶ 29. Rather, because there is record support for the juvenile court's finding, we cannot disturb it. *See id.*

## IV. Disposition

¶ 32 The judgment is affirmed.

14

JUDGE WELLING and JUDGE LUM concur.